AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture          AUSA Brian Williamson, 312-353-8897

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**FILED**

**6/10/2024**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

In the Matter of the Seizure of:

Case No. 24 M 459

Up $1,368,170 in US Bank account number 169702121529 ("**Subject Account 1**"); up to $367,288 in US Bank account number 169700979688 ("**Subject Account 2**"); and up to $14,250 in US Bank account number 169702235253 ("**Subject Account 3**")

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Michael D'Andrea, a Special Agent with the Internal Revenue Service – Criminal Investigation, request a seizure warrant and state under penalty of perjury that I have reason to believe that there is certain property, which is subject to seizure, namely:

Up $1,368,170 in US Bank, which is located at 80 S. 8th Street, Ste. 224, Minneapolis, MN 55402, in account number 169702121529 ("**Subject Account 1**"); up to $367,288 in US Bank account number 169700979688 ("**Subject Account 2**"); up to $14,250 in US Bank account number 169702235253 ("**Subject Account 3**")

which is civilly forfeitable under 18 U.S.C. § 981(a)(1)(A), including cross-references to 18 U.S.C. §§ 1956 and 1957, and 21 U.S.C. § 881(a)(6), and criminally forfeitable under 18 U.S.C. § 982(a)(1), as funds involved in transactions or attempted-transactions in violation of 18 U.S.C. §§ 1956 and 1957 and as funds derived from proceeds traceable to specified unlawful activity, namely, unlawful distribution of controlled substances in violation of 21 U.S.C. §§ 841 and 846, and which property is therefore also subject to seizure for purposes of criminal forfeiture under 21 U.S.C. § 853(a)(1).

The application is based on these facts:

**See Attached Affidavit**,

Continued on the attached sheet.

_____
*Applicant's Signature*

Michael D'Andrea, Special Agent
Internal Revenue Service
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: June 10, 2024 _____          _____
*Judge's signature*

City and State: Chicago, Illinois _____          Gabriel A. Fuentes, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

ss

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, Michael D'Andrea, Special Agent, Internal Revenue Service – Criminal Investigation, being duly sworn, deposes and states as follows:

### BACKGROUND OF AFFIANT

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a seizure warrant.

2.      I am a Special Agent with the Internal Revenue Service - Criminal Investigation ("IRS-CI") and have been so employed since approximately December 2018.  I am currently a Task Force Officer with Homeland Security Investigations ("HSI"), and assigned to the Financial Crimes Task Force ("FCTF") and to the High Intensity Drug Trafficking Area ("HIDTA") Task Force in Chicago, Illinois. I have participated in federal search and seizure warrants to include warrants pertaining to the seizure of digital information and digital assets.

3.      As part of my duties as an IRS-CI Special Agent, I investigate criminal violations related to tax crimes and financial crimes, including money laundering. I have participated in the execution of multiple federal search and seizure warrants. Based on my training and experience, I am familiar with the methods and practices

used by individuals and organizations involved in illicit activities to launder their proceeds, which include cash purchases, purchasing monetary instruments with cash, the use of cryptocurrencies and businesses in an attempt to legitimize and conceal their activities, transferring funds to domestic bank accounts utilizing foreign bank accounts, smuggling cash in and out of the United States, and providing materially false information to financial institutions as a means to obtain assets and conceal the source of funds. I have also received significant training in the field of narcotic investigations and enforcement. Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by people engaged in the trafficking of illegal drugs.

## PURPOSE OF AFFIDAVIT

4. This affidavit is submitted in support of an application for a combined criminal and civil forfeiture seizure warrant to seize funds not to exceed $1,368,170 from US Bank account number 169702121529 ("**Subject Account 1**"), funds not to exceed $367,288 from US Bank account number 169700979688 ("**Subject Account 2**"), and funds not to exceed $14,250 from US Bank account number 169702235253 ("**Subject Account 3**"), (collectively the "**Subject Accounts**" and the "**Subject Funds**") on the grounds that they constitute proceeds of narcotics offenses, in violation of Title 21, United States Code, Sections 841(a)(1) (distribution of a controlled substance), 846 (attempt and conspiracy to possess with intent to

2

distribute and distribute controlled substances) and 843(b) (use of any communication facility), and money laundering offenses, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957 (collectively the "**Subject Offenses**").

5.      In summary, as set forth below, I submit that there is probable cause to believe that the **Subject Accounts** constitute proceeds, or property traceable to proceeds, of a narcotics offense or offenses and accordingly are subject to civil forfeiture under Title 21, United States Code, Section 881(a)(6) and criminal forfeiture pursuant to Title 21, United States Code, Sections 853(a)(1).

6.      Further, based upon all the foregoing, probable cause also exists to believe that the funds and items of value held in the identified accounts are property involved in money laundering violations, 18 U.S.C. §§ 1956 and 1957, and are, therefore, subject to civil forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and criminal forfeiture pursuant to Title 18, United States Code, Sections 982(a)(1).

7.      This affidavit is based upon my personal knowledge, interviews of witnesses, my review of documents and other evidence, my conversations with other law enforcement personnel to include forensic accountants knowledgeable about cryptocurrency, information received concerning the use of computers in criminal activity, and my training and experience. Because this affidavit is being submitted

3

for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. All dates and dollar amounts referenced herein are approximate. I have set forth only the facts that I believe are necessary to establish probable cause to seize the **Subject Funds**.

## Background on Cryptocurrency

8.     Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Monero, and Litecoin. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally,

4

cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[1] Cryptocurrency, itself, is not illegal in the United States.

        b.     Bitcoin [2] ("BTC") is a type of cryptocurrency. Payments or transfers of value made with Bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire Bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin ATMs, or directly from other people.

        c.     Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" Bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of

---

[1]     Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

5

electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

        d.      Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is usually represented as a case-sensitive string of letters and numbers, 26–90 characters long, often depending on the cryptocurrency protocol. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or

PIN—needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

e. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes— for example, as payment for illegal goods and services and to commit money laundering. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases.

f. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop ("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can access the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey,

or Nano Ledger). In addition, paper wallets contain an address and a QR code with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).

g. "Exchangers" and "exchanges" are individuals or companies that exchange Bitcoin or other cryptocurrencies for other currencies, including U.S. dollars. According to the United States Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger operating as a business, are considered money services businesses.[3] Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law). From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC")

---

[3]  *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," available at https://www.fincen.gov/resources/statutesregulations/guidance/application-fincens-regulations-persons-administering.

protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and the full bank account and routing numbers that the customer links to an exchange account. As a result, there is significant market demand for illicit cryptocurrency-for-fiat-currency exchangers, who lack AML or KYC protocols and often also advertise their ability to offer customers anonymity. These illicit exchangers routinely exchange fiat currency for cryptocurrencies by meeting customers in person or by shipping cash through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9–10% (in contrast to registered and Bank Secrecy Act-compliant exchangers, who may charge fees as low as 1– 2%).

    h.  Some companies offer cryptocurrency wallet services, which allow users to download a digital wallet application onto their smart phone or other digital device. A user typically accesses the wallet application by inputting a user-generated PIN code or password. Users can store, receive, and transfer cryptocurrencies via the application; however, many of these companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the specific device on which the

wallet application was installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet as described above, law enforcement may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

## I.       FACTS SUPPORTING SEIZURE

### Background of the Presidential Clouds DTO

9.      Internal Revenue Service-Criminal Investigation ("IRS-CI"), the Drug Enforcement Administration ("DEA"), and the United States Postal Inspection Service ("USPIS") are investigating violations of the **Subject Offenses** committed by the Presidential Clouds drug trafficking organization (the "Presidential Clouds DTO"). On or about December 18, 2023, a DEA confidential source (CS) provided law enforcement officers with the Telegram username @PresidentialClouds12, stating that the individual utilizing that account was operating a telegram channel (the

"Presidential Clouds Channel") where various cannabis and psychedelic substances were sold.

10. On or about January 16, 2024, law enforcement officers, acting in an undercover capacity (the "UCs"), utilized the Telegram messaging application to gain access to the Presidential Clouds Channel, accessible via the website https://t.me/+XjsVKu8Z5t1lM2Ux. The channel was advertised via the publicly available "bio" or biography section of the Telegram user @PresidentialClouds12. Although not publicly accessible, the Telegram channel accepted a request by the UCs to join the channel, thus allowing access.

11. At that time, the Presidential Clouds Channel consisted of approximately 4,800 subscribers able to view the channel, but only three users appeared to have posting privileges; @PresidentialClouds12, @PresidentialSupport, and @PresidentialManager. The channel was active as of March 13, 2024 and advertised the sale of bulk marijuana, psilocybin mushrooms, and other cannabis-related products (vape cartridges, THC concentrates, etc.), with product images (as depicted below) and sophisticated rating and pricing systems.

11



**Sample Listings from the Presidential Clouds Channel**

12.     The Presidential Clouds Channel described the roles of the three users operating it; @PresidentialSupport: customer service and online sales, @PresidentialManager: shipping manager and in-person sales, and @PresidentialClouds12: the President. The channel informed customers that sales may also be submitted via an online form accessible at https://fs7.formsite.com/r5HpEX/6ugu4l9hhd/index.

13.     Because the Presidential Clouds Channel did not allow others to post, @PresidentialClouds12 advertised a "discussion group" called "Presidential's House

12

of Representatives" (hereinafter referred to as "the House of Representatives Channel"), accessible via the website https://t.me/+qe8mtl8jaXswMjEx.

14.     The Presidential Clouds Channel further stated that the DTO was based in southern Oregon, but narcotics shipped nationwide via United States Postal Service (USPS) and United Parcel Service (UPS). As depicted below, the organization offered insurance on narcotics packages for a fee, protecting customers in the event that a parcel was seized in transit. Customers were informed that they may also purchase narcotics locally for orders in excess of $10,000. Cash could also be mailed to an undisclosed address and customers could use CashApp to pay for their narcotics purchases as well.



**Excerpt of Presidential Clouds Channel's Operating Rules**

15.     Other forms of payment included the following cryptocurrencies: Monero (XMR), Bitcoin (BTC), Ethereum (ETH), and Tether (USDT). The Presidential Clouds Channel stated that cryptocurrency wallets were posted at the beginning of each month for narcotics purchases made within that month.

16.     The                          cryptocurrency                          wallet bc1q3ccwg0x22u2zafpgejyamxu67mytkppvxgh8qw     (hereinafter     referred     to     as

14

"**Wallet #1**") was posted on the Presidential Clouds Channel as the BTC deposit wallet for narcotics customers to use for the month of January 2024.

### Probable Cause That Subject Accounts 1 and 2 Received Narcotics Proceeds from the STURGEON Coinbase Account

17.     In summary, and as further described below, law enforcement believes the user of @PresidentialClouds12 was Justin STURGEON. Specifically, law enforcement, using blockchain and other financial analysis, tracked the vast majority of proceeds traveling from the Presidential Clouds crypto wallet to a secondary crypto wallet, and from there to a Coinbase account. From the Coinbase account, the funds traveled to bank accounts controlled by STURGEON and his girlfriend, Haleigh POLING.

18.     On February 7, 2024, blockchain analysis of **Wallet #1** revealed 603 deposits totaling 10.15049261 bitcoin (BTC) worth approximately $435,195 between January 1, 2024 and February 1, 2024. Between those same dates, **Wallet #1** made 20 transfers totaling 9.17137464 BTC worth approximately $395,309 to BTC address bc1qz76993s5u59fuufe49hp8qdtrl6g8zau9v4p4d ("**Wallet #2**"). **Wallet #2** has been active since September 25, 2023 and has received 52.62617817 BTC worth approximately $1,892,702.

19.     Between December 20, 2023, and February 3, 2024, **Wallet #2** made 13 transfers totaling 21.89880253 BTC worth approximately $798,976 to BTC address 38XXsheZeDXca1takPEPweXRcrunwS5AqH,       an       address       controlled

15

by Coinbase Global Inc. A subpoena to Coinbase revealed that BTC address 38XXsheZeDXca1takPEPweXRcrunwS5AqH was registered to their customer, Justin STURGEON. According to Coinbase records, STURGEON opened the account using his Ohio driver's license[4] and included a self-portrait image as verification (the "STURGEON Coinbase Account"). Records showed two verified bank accounts on STURGEON's Coinbase Account affiliated with **Subject Account 1** and **Subject Account 2**.

20. As of February 18, 2024, STURGEON's Coinbase account has received 60.12578055 BTC worth approximately $1,940,100 since its first BTC deposit on April 15, 2023. STURGEON also had transactions in USD Coin (USDC) and USD Tether (USDT) worth approximately $79,197 and $48,033 respectively. Additionally, as documented in the below table, from on or about April 15, 2023 through January 16, 2024, approximately 35 Bitcoin sales occurred in the STURGEON Coinbase Account which were greater than $10,000. The sales of Bitcoin resulted in the purchase of United States Dollars ("USD"):

| TIMESTAMP | AMOUNT | TYPE | TRANSACTION TYPE |
|---|---|---|---|
| 01/16/2024 16:36 | $ 12,000 | USD | BITCOIN SALE |
| 01/16/2024 16:36 | $ 20,001 | USD | BITCOIN SALE |
| 01/16/2024 16:36 | $ 12,488 | USD | BITCOIN SALE |
| 01/16/2024 16:36 | $ 20,000 | USD | BITCOIN SALE |
| 01/16/2024 16:36 | $ 10,335 | USD | BITCOIN SALE |
| 01/10/2024 13:05 | $ 10,001 | USD | BITCOIN SALE |

---

[4] According to records from the State of Ohio, a driver license in STURGEON's name and the ID number match the records from Coinbase.

| | | | |
|---|---|---|---|
| 12/24/2023 13:17 | $ 14,715 | USD | BITCOIN SALE |
| 12/24/2023 13:17 | $ 14,716 | USD | BITCOIN SALE |
| 12/20/2023 9:29 | $ 15,241 | USD | BITCOIN SALE |
| 12/08/2023 13:45 | $ 25,176 | USD | BITCOIN SALE |
| 11/28/2023 23:36 | $ 160,598 | USD | BITCOIN SALE |
| 11/28/2023 14:19 | $ 38,054 | USD | BITCOIN SALE |
| 11/25/2023 9:22 | $ 48,755 | USD | BITCOIN SALE |
| 11/17/2023 0:28 | $ 31,124 | USD | BITCOIN SALE |
| 11/05/2023 23:08 | $ 29,997 | USD | BITCOIN SALE |
| 11/02/2023 12:00 | $ 40,718 | USD | BITCOIN SALE |
| 10/19/2023 22:45 | $ 67,674 | USD | BITCOIN SALE |
| 10/06/2023 13:46 | $ 52,076 | USD | BITCOIN SALE |
| 10/02/2023 11:08 | $ 48,705 | USD | BITCOIN SALE |
| 09/27/2023 22:49 | $ 104,044 | USD | BITCOIN SALE |
| 09/22/2023 9:15 | $ 30,230 | USD | BITCOIN SALE |
| 09/15/2023 8:27 | $ 64,650 | USD | BITCOIN SALE |
| 09/07/2023 13:41 | $ 59,189 | USD | BITCOIN SALE |
| 09/01/2023 13:11 | $ 48,487 | USD | BITCOIN SALE |
| 08/19/2023 9:51 | $ 23,022 | USD | BITCOIN SALE |
| 08/02/2023 12:47 | $ 81,211 | USD | BITCOIN SALE |
| 07/19/2023 23:54 | $ 33,332 | USD | BITCOIN SALE |
| 07/16/2023 23:01 | $ 42,450 | USD | BITCOIN SALE |
| 06/28/2023 15:33 | $ 29,045 | USD | BITCOIN SALE |
| 06/28/2023 15:32 | $ 50,506 | USD | BITCOIN SALE |
| 06/13/2023 22:28 | $ 132,431 | USD | BITCOIN SALE |
| 05/23/2023 17:34 | $ 99,883 | USD | BITCOIN SALE |
| 05/23/2023 17:25 | $ 68,985 | USD | BITCOIN SALE |
| 05/13/2023 13:01 | $ 10,017 | USD | BITCOIN SALE |
| 04/15/2023 12:56 | $ 10,069 | USD | BITCOIN SALE |

21.    In    summary,    the    STURGEON    Coinbase    Account    withdrew approximately $1,986,599 between April 16, 2023, and February 3, 2024 to the **Subject Account 1** and **Subject Account 2**.

22.     As documented below, according to records from US Bank, from on or about June 28, 2023 through January 16, 2024, approximately $1,368,170 was withdrawn from the STURGEON Coinbase Account to **Subject Account 1**, and approximately 24 transfers were completed that were greater than $10,000.  From on or about April 17, 2023 through November 2, 2023, approximately $353,548 was withdrawn from the STURGEON Coinbase Account to **Subject Account 2**, and approximately four transfers were completed greater than $10,000:

| DATE | AMOUNT | TRANSACTION TYPE | ACCOUNT |
|------|--------|------------------|---------|
| 06/28/2023 | $        77,430 | DEPOSIT | **Subject Account 1** |
| 07/17/2023 | $        41,248 | DEPOSIT | **Subject Account 1** |
| 07/20/2023 | $        32,358 | DEPOSIT | **Subject Account 1** |
| 08/02/2023 | $        79,048 | DEPOSIT | **Subject Account 1** |
| 08/21/2023 | $        22,302 | DEPOSIT | **Subject Account 1** |
| 09/01/2023 | $        47,135 | DEPOSIT | **Subject Account 1** |
| 09/07/2023 | $        57,577 | DEPOSIT | **Subject Account 1** |
| 09/15/2023 | $        62,896 | DEPOSIT | **Subject Account 1** |
| 09/22/2023 | $        29,324 | DEPOSIT | **Subject Account 1** |
| 09/28/2023 | $       101,315 | DEPOSIT | **Subject Account 1** |
| 10/02/2023 | $        47,345 | DEPOSIT | **Subject Account 1** |
| 10/06/2023 | $        50,633 | DEPOSIT | **Subject Account 1** |
| 10/20/2023 | $        65,852 | DEPOSIT | **Subject Account 1** |
| 11/06/2023 | $        29,104 | DEPOSIT | **Subject Account 1** |
| 11/17/2023 | $        30,193 | DEPOSIT | **Subject Account 1** |
| 11/27/2023 | $        47,394 | DEPOSIT | **Subject Account 1** |
| 11/28/2023 | $        36,465 | DEPOSIT | **Subject Account 1** |
| 11/29/2023 | $       154,973 | DEPOSIT | **Subject Account 1** |
| 12/08/2023 | $        24,124 | DEPOSIT | **Subject Account 1** |
| 12/11/2023 | $        47,191 | DEPOSIT | **Subject Account 1** |
| 12/20/2023 | $        38,950 | DEPOSIT | **Subject Account 1** |
| 12/26/2023 | $        98,218 | DEPOSIT | **Subject Account 1** |
| 01/10/2024 | $        49,439 | DEPOSIT | **Subject Account 1** |
| 01/16/2024 | $        97,655 | DEPOSIT | **Subject Account 1** |

| | | | |
|---|---|---|---|
| **Grand Total** | **$ 1,368,170** | | |

| DATE | AMOUNT | TRANSACTION TYPE | ACCOUNT |
|---|---|---|---|
| 04/17/2023 | $ 9,623 | DEPOSIT | **Subject Account 2** |
| 05/15/2023 | $ 9,621 | DEPOSIT | **Subject Account 2** |
| 05/23/2023 | $ 66,745 | DEPOSIT | **Subject Account 2** |
| 05/23/2023 | $ 96,752 | DEPOSIT | **Subject Account 2** |
| 06/14/2023 | $ 131,242 | DEPOSIT | **Subject Account 2** |
| 11/02/2023 | $ 39,565 | DEPOSIT | **Subject Account 2** |
| **Grand Total** | **$ 353,548** | | |

23.     Additionally, on or about February 9, 2024, STURGEON's Coinbase account received a transfer of 1.50251558 BTC, worth approximately $68,070, directly from cryptocurrency wallet, bc1qmvm0lzy66hlhsj3fa3axm7hgst2pg2jf0ut5cg, advertised as the February 2024 deposit address for Presidential Clouds narcotics customers on the Presidential Clouds Channel.

24.     Based on my training and experience, and familiarity with the investigation, I believe the above-described transactions show that the Presidential Clouds DTO advertised cryptocurrency wallets, such as **Wallet #1**, for their customers to use for narcotics purchases. These wallets then direct funds into longer-term accounts, such as **Wallet #2**. STURGEON's personal and business accounts were far and away the largest beneficiaries of these aggregated funds and an analysis

of STURGEON and POLINGS' financial records indicated that these proceeds were spent on a luxurious lifestyle.[5]

25.     Furthermore, in February 2022, STURGEON applied for a marijuana worker permit through the Oregon Liquor and Cannabis Commission (OLCC). OLCC records showed that STURGEON utilized the username "Jsturgeon12" and listed an email, phone number, and residence consistent with his Coinbase account. Jsturgeon12 bears resemblance to the Telegram moniker utilized by the manager of the Presidential Clouds Channel, @PresidentialClouds12. STURGEON failed to pay fees associated with the application and no permit was ever issued to STURGEON.

26.     According to records obtained from Oregon Secretary of State (OSS), STURGEON filed Articles of Organization with the OSS establishing PRESIDENTIAL CLOUDS LLC in April 2022. STURGEON was listed as the organizer, the individual with direct knowledge, and manager of PRESIDENTIAL CLOUDS LLC. STURGEON also listed the address 2 South Barenburg Road, Medford, Oregon as the principal place of business, consistent with the residential address provided by STURGEON on his marijuana worker permit two months prior.

27.     In April 2023, STURGEON filed an Amended Annual Report with OSS for PRESIDENTIAL CLOUDS LLC. In that report, the primary place of business was

---

[5]     STUREGON and POLINGS' US Bank records show thousands in expenditures on luxury brand named goods such as Gucci, Louis Vuitton, Chanel, and over $170,000 in down payments on three vehicles in the past six months.

given as 3472 Poppywoods Drive, Medford, Oregon, consistent with the residential address registered to STURGEON's Coinbase account. The April 2023 filing also listed STURGEON as the manager of PRESIDENTIAL CLOUDS LLC and included the following statement: "WE CREATE, MARKET AND SELL CLOTHING".

28.     In May 2023, STURGEON filed Articles of Amendment with OSS for PRESIDENTIAL CLOUDS LLC, changing the name of the organization to MINIMALISTIX LLC. STURGEON is again listed as the manager and individual with direct knowledge on the filing. According to business records obtained from TransUnion, STURGEON had previously represented himself as "CEO" of MINIMALISTIX LLC to creditors in January 2024.

29.     Based on my training and experience, and familiarity with the investigation, I believe the above-described business records show an intent by STURGEON to obtain a marijuana worker's permit just before establishing a limited liability corporation named PRESIDENTIAL CLOUDS, consistent with the naming, branding, and geographic location associated with the PRESIDENTIAL CLOUDS DTO. Additionally, the same month that STURGEON began withdrawing large amounts of narcotics proceeds from his Coinbase account, STURGEON filed to have the name of PRESIDENTIAL CLOUDS LLC changed to MINIMALISTIX LLC to obfuscate the source of the funds.

21

30.     On     October     24,     2023,     at     approximately     10:48     p.m.,
@PresidentialClouds12 responded to a user on the House of Representatives Channel
who     was     speculating     as     to     what     @PresidentialClouds12     looked     like.
@PresidentialClouds12 responded, "I'm 6"5 250lbs & from the streets and that's
facts." According to STURGEON's valid Ohio driver's license, STURGEON is six feet,
five inches tall. No weight is listed on the driver's license, but an arrest record from
Jackson County Sherriff's Office from January 5, 2024 listed STURGEON's weight
as 250 pounds.

31.     Based on my training and experience, and familiarity with the
investigation, I believe the above-described financial and business records indicate
that (1) the PRESIDENTIAL CLOUDS DTO advertised cryptocurrency wallets that
changed on a monthly basis for their customers to utilize for their narcotics
purchases, which averaged more than $450,000 in deposits per month since
September 2023; (2) the PRESIDENTIAL CLOUDS DTO typically funneled those
funds into secondary cryptocurrency wallets, the most recent of which has been active
since September 2023 and has had more than $1.8 million in deposits; (3) Justin
STURGEON was the most prominent beneficiary of those proceeds via deposits to his
Coinbase account directly and indirectly from cryptocurrency wallets advertised by
the PRESIDENTIAL CLOUDS DTO; (4) STURGEON had previously sought a
marijuana worker's permit from the Oregon Liquor and Cannabis Commission two

22

months before establishing PRESIDENTIAL CLOUDS LLC; (5) STURGEON has withdrawn more than $1.3 million in funds from his Coinbase account to a US Bank business account established for PRESIDENTIAL CLOUDS LLC; (6) Telegram user @PresidentialClouds12, who proports to run the PRESIDENTIAL CLOUDS DTO, has described themselves as six foot, five inches tall and weighing 250 pounds, consistent with the physical description of Justin STURGEON. Based on these indications, I believe Justin STURGEON owns and operates the Presidential Clouds Telegram Channel, to include the @PresidentialClouds12 username and related business entities.

## The Subject Accounts Receive Narcotic Proceeds
## Tied To The Presidential Clouds DTO

32. According to records from US Bank, STURGEON maintained the following bank accounts:

| Account Name | Financial Institution | Acct. Number | Date Opened | Date Closed | Reference Name |
|---|---|---|---|---|---|
| PRESIDENTAL CLOUDS LLC / MINIMALISTIX LLC | US Bank | -1529 | 05/31/2023 | N/A | **Subject Account 1** |
| JUSTIN LUKE STURGEON HALEIGH NICOLE POLING | US Bank | -9688 | 05/31/2023 | N/A | **Subject Account 2** |
| NEXT HOME LLC | US Bank | -5253 | 10/26/2023 | N/A | **Subject Account 3** |

23

| | | | | | |
|---|---|---|---|---|---|
| JUSTIN LUKE STURGEON | US Bank | -4813 | 05/31/2023 | N/A | Account 4 |
| KEEGAN STURGEON MINOR JUSTIN LUKE STURGEON CUSTODIAN HALEIGH NICOLE POLING CUSTODIAN | US Bank | -2883 | 05/31/2023 | N/A | Account 5 |
| ADDISON STURGEON MINOR JUSTIN LUKE STURGEON CUSTODIAN HALEIGH NICOLE POLING CUSTODIAN | US Bank | -2891 | 05/31/2023 | N/A | Account 6 |
| STURGEON CONSTRUCTION LLC | US Bank | -4323 | 01/10/2024 | N/A | Account 7 |

33. As detailed above, according to records from US Bank, **Subject Account 1**, is a checking account which was established by STURGEON on or about May 31, 2023. On or about September 7, 2023 a business signature card addendum was electronically signed by STURGEON and filed with US Bank to change the account name from PRESIDENTIAL CLOUDS LLC to MINIMALISTIX LLC.

a. From on or about June 28, 2023 through January 16, 2024, approximately $1,368,170 was deposited from the STURGEON Coinbase Account to **Subject Account 1**.

b. From on or about October 26, 2023, **Subject Account 1** transferred funds totaling approximately $5,000 to **Subject Account 3**.

24

c.      As of March 29, 2024 the balance in **Subject Account 1** is $18,567.

34.      According to records from US Bank, **Subject Account 2**, is a checking account which was established by STURGEON and POLING on or about May 31, 2023.

a.      From on or about April 17, 2023 through November 2, 2023, approximately $353,548 was deposited from the STURGEON Coinbase Account to **Subject Account 2**.

b.      From on or about March 6, 2023 through April 14, 2023, approximately $13,740 in cash was deposited in **Subject Account 2**.

c.      As of April 16, 2024 the balance in **Subject Account 2** is $775.

35.      According to records from US Bank, **Subject Account 3**, is a checking account which was established on or about October 26, 2023 in the name of NEXT HOME LLC.[6]

a.      On or about October 26, 2023, **Subject Account 3** received a transfer of approximately $5,000 from **Subject Account 1**.

b.      On or about December 1, 2023, **Subject Account 3** received a cash deposit of approximately $9,250.

---

[6] In October 2023, STURGEON filed an Articles of Organization with OSS for NEXT HOME LLC. In that report, the primary place of business was given as the STURGEON Residence. The October 2023 filing also listed STURGEON as the manager of NEXT HOME LLC.

25

c.      As of March 29, 2024 the balance in **Subject Account 3** is $2,270.

36.      Based on my training and experience, and familiarity with the investigation, I believe the above-described financial records indicate that (1) both **Subject Account 1** and **Subject Account 2** received funds totaling approximately $1,721,718 from the STURGEON Coinbase Account which received narcotic proceeds tied to the PRESIDENTIAL CLOUDS DTO; (2) **Subject Account 1** transferred funds totaling approximately $5,000 to **Subject Account 3**; and (3) STURGEON has engaged in a repeated pattern to conceal proceeds from law enforcement officials through the use of multiple business entities and financial institutions.

**Subject Accounts 1, 2, 3 Use Narcotic Proceeds
on Expenditures Greater Than $10,000**

37.      From approximately June 28, 2023 through January 25, 2024, **Subject Account 1** made expenditures of narcotic proceeds for the following:

a.      $75,000 to Covert Buick for the purchase of a 2023 Cadillac CT5-V Blackwing;

b.      $73,300 to Covert Cadillac for the purchase of a 2023 Cadillac Escalade;

c.      $42,554 to First American Title for the purchase of real-estate property located at 2365 Meadows Lane, Medford, Oregon; and

d.      $30,000 to Lithia Chrysler for the purchase of a 2019 Ram 3500 Laramie.

26

38.     On or about October 3, 2023, **Subject Account 2** made an expenditure of narcotic proceeds of approximately $106,000 to Cynthia Blair for a mortgage payment for property located at 1450 Wagon Trail Drive, Jacksonville, Oregon (the "STURGEON Residence").

### March 13, 2024 Execution of Search Warrants and Interview of STURGEON

39.     On or about March 13, 2024, law enforcement officials executed two premises search warrants authorized by the U.S. Oregon District Court. Law enforcement officials encountered STURGEON at the STURGEON Residence. After law enforcement officials advised STURGEON of his *Miranda* rights and after STURGEON orally waived his *Miranda* rights, STURGEON stated:

a.     He is the administrator of the Presidential Clouds Channel and uses the username @PresidentialClouds12;

b.     STURGEON cashes out Bitcoin through the STURGEON Coinbase Account and transfers the funds to his US Bank accounts;

c.     STURGEON also receives payments for narcotics via CashApp;

d.     The PRESIDENTIAL CLOUDS DTO receives cash through the mail or cash is also picked up locally in the Medford, Oregon area from narcotics customers;

e.     STURGEON has exchanged Bitcoin for cash with multiple individuals;

f.      STURGEON tried to hire a third party to remove references of PRESIDENTIAL CLOUDS LLC from the Internet; and

g.      STURGEON only sold marijuana and psychedelic mushrooms;

40.    Based on my training and experience, and familiarity with the investigation, I believe (1) the funds received into the STURGEON Coinbase Account are narcotic proceeds; (2) the subsequent conversion of Bitcoin to USD and withdrawals from the STURGEON Coinbase Account to **Subject Account 1** and **Subject Account 2** are used to conceal the commission of the **Subject Offenses**; (3) the transfers of funds from **Subject Account 1** to **Subject Account 3**, are narcotic proceeds tied to STURGEON's PRESIDENTIAL CLOUDS DTO; and (4) the cash deposits received into **Subject Account 2** and **Subject Account 3** are narcotic proceeds and are subject to forfeiture.

### Need for Seizure of the Subject Funds Pursuant to Title 18, United States Code, Section 853(f)

41.    Title 18, United States Code, Sections 981(a)(1)(A) and (b)(3) authorize the civil forfeiture of funds derived from proceeds traceable to money laundering offenses in violation of Title 18, United States Code, Sections 1956 and 1957.  Title 18, United States Code, Sections 982(a)(1) and (b)(1) authorize the criminal forfeiture of property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to money laundering offenses in violation of Title 18, United States Code, Sections 1956 and 1957.  Title 21, United States Code, Sections

28

881(a)(6), 853(a)(1), and 853(f) authorize the criminal forfeiture of any property constituting, or derived from, any proceeds a person obtained, directly or indirectly, as a result of a violation of federal narcotics laws, including Title 21, United States Code, Section 843(b).

42.     The probable cause showing is the same for Section 981(b) and Title 21, United States Code, Section 853(f) (governing seizure of property traceable to violation of federal drug laws), except that the latter also requires a showing that a restraining order "may not be sufficient to assure the availability of the property for forfeiture." There is a substantial risk that the **Subject Funds** will be withdrawn, moved, dissipated, or otherwise become unavailable for forfeiture unless immediate steps are taken to secure them at the time the requested searches are executed. I therefore submit that a protective order under 21 U.S.C. § 853(e) would not be sufficient to assure that the **Subject Funds** will remain available for forfeiture.

43.     I know from my training and experience that unless the **Subject Funds** are seized, it can be difficult to preserve the **Subject Funds** for forfeiture purposes. In order to ensure that the **Subject Funds** are available for forfeiture, Title 21, United States Code, Section 853(e) and Title 18, United States Code, Section 983(j) authorizes the entry of a restraining order or any other action necessary to preserve the property, and Title 21, United States Code, Section 853(f) and Title 18, United States Code, Section 981(j) states that, in the same manner as provided for a search

29

warrant, a seizure warrant may be issued when the property would, in the event of conviction, be subject to forfeiture and a restraining order may not be sufficient to assure the availability of the property for forfeiture.

44.     As set forth above, the **Subject Funds** include funds that (a) are traceable to proceeds of a narcotics offense and (b) were transferred to the **Subject Accounts** to launder the proceeds as part of concealment money laundering conduct. All the **Subject Funds** are therefore subject to forfeiture because they were involved in apparent concealment money laundering conduct.

45.     For the reasons listed above, the United States seeks combined criminal and civil seizure warrants, authorizing law enforcement to seize the **Subject Funds** and preserve them pending further forfeiture proceedings.

## III.    CONCLUSION

46.    Based on the above information, there is probable cause to believe that the **Subject Funds**, held at Coinbase in the **Subject Account**, are subject to seizure because they are property constituting, or derived from, proceeds of the **Subject Offenses**, and/or are used to conceal the commission of the **Subject Offenses**.  I therefore respectfully request that this Court issue a warrant to seize the **Subject Funds** held by US Bank.

Respectfully submitted,

_____
Michael D'Andrea
Special Agent
IRS – Criminal Investigation

Sworn to and affirmed by telephone on June 10, 2024

_____
GABRIEL A. FUENTES
UNITED STATES MAGISTRATE JUDGE

31

## ATTACHMENT A

PROPERTY TO BE SEIZED

1.  Up $1,368,170 in US Bank, which is located at 80 S. 8th Street, Ste. 224, Minneapolis, MN 55402, in account number 169702121529 ("**Subject Account 1**");

2.  Up to $367,288 in US Bank account number 169700979688 ("**Subject Account 2**"); and

3.  Up to $14,250 in US Bank account number 169702235253 ("**Subject Account 3**").